UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 23-cr-432 RBW |
| v. : | |
| : | |
| XYAN CLARY, : | |
| : | |
| Defendant : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Xyan Clary to 45 days of incarceration, 24 months of probation, 60 hours of community service, and $500 in restitution.

I.   **Introduction**

Defendant Xyan Clary, a 24-year-old warehouse manager, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Xyan Clary pled guilty to one count of Entering and Remaining within a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by Clary's decision to (1) climb atop the Peace Monument; (2) climb past other rioters to reach the Upper West Terrace; (3) climb through a window to exit the Capitol; and (4) remain on the Upper West Terrace for an extended period of time.

The Court must also consider that Xyan Clary's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Clary's crime support a sentence of 45 days of incarceration followed by 24 months of probation.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 39, p. 1-3 (Statement of Offense).

### Defendant Clary's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Xyan Clary appeared in open-source video walking north on 15th Street, N.W., and turning east on Pennsylvania Avenue, N.W., to reach the Capitol. On that day, he wore a red baseball cap, a red and black flannel, blue jeans, and carried a Gadsden Flag. *See* Image 1.



*Image 1: Xyan Clary, circled in yellow, walking north on 15th Street, N.W.*

Xyan Clary approached the restricted grounds along Pennsylvania Avenue, N.W., where he took a position on top of the Peace Monument at around 2:00 p.m.



*Image 2: Xyan Clary atop Peace Monument facing toward the Capitol.*

Xyan Clary spent approximately 24 minutes at this location until jumping down and walking closer toward the Capitol. Clary and his mother walked along the Pennsylvania Avenue Walkway and headed up the Northwest Stairs towards the Upper West Terrace. There was congestion at the narrow stairwell, but Xyan Clary climbed atop the balustrade and moved past his fellow rioters.



*Image 3: CCTV at approximately 2:43 p.m. Defendant climbing Balustrade.*

Xyan Clary briefly paused to join in chants before continuing to the Upper West Terrace. At the terrace, Clary removed his hat and sang an impromptu rendition of the National Anthem.



*Image 4: CCTV at approximately 2:59 p.m.*

After another 20-minute period, Xyan Clary entered the building through the Senate Wing door at approximately 3:21 p.m.

Although Xyan Clary entered through the Senate Wing Door, he exited through the Senate Wing window at approximately 3:27 p.m.



Image 5: On the left, Xyan Clary entered through the Senate Wing Door; on the right, he exited 6 minutes later through the Senate Wing Window

During his time inside the Capitol, Xyan Clary would have heard the door alarm blaring. Further, the line of police officers wearing helmets is a clear sign that Xyan Clary's entrance into the building was not allowed.



Image 6: Xyan Clary, circled in yellow, waited to leave out of window

Once outside, again on the Upper West Terrace, Xyan Clary remained until the police pushed him and his group off the terrace.

*The Charges and Plea Agreement*

On December 13, 2023, the United States charged Xyan Clary by a one-count Information with violating 18 U.S.C. 1752(a)(1). On February 29, 2024, pursuant to a plea agreement, Clary pled guilty to the Information. By plea agreement, Clary agreed to pay $500 in restitution to the Architect of the Capitol.

### III. Statutory Penalties

Clary now faces a sentencing. As noted by the plea agreement and the U.S. Probation Office, Xyan Clary faces up to one year of imprisonment and a fine of up to $100,000. Clary must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV. The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Adjustment for certain zero-point offenders | <u>-2</u> |
| Total Adjusted Offense Level | 2 |

7

*See* PSR at ¶¶ 37 - 45.

While the Government concedes that Section 4C1.1 applies to Clary, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because Clary's presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that Clary in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus, Xyan Clary's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical

8

data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Clary's criminal history in category I. PSR at ¶ 48. Accordingly, the U.S. Probation Office calculated Clary's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 86. Clary's plea agreement contains an agreed-upon Guidelines' calculation that closely mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

V.      **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 45 days incarceration, with 24 months of probation.

9

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Clary's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Clary, the absence of violent or destructive acts is not a mitigating factor. Had Clary engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Clary's case is that he climbed on the Peace Monument, the balustrade, and through a window. The area once described by Pierre Charles L'Enfant in 1791 as, "a pedestal waiting for a monument," quickly became Xyan Clary's jungle gym. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Clary's History and Characteristics

Clary graduated high school in 2018. He attended Lancaster Christian Academy in Smyrna Tennessee, a private school. Clary has reported that he completed one semester from a public community college in Tullahoma, Tennessee. Although it is unclear why Clary stopped his education, the timing coincides with a short-lived marriage.

Clary noted both that he is a member of the Boy Scouts of America as well as a member of the Jefferson Pike Church of Christ, which is located in La Vergne, Tennessee. Nothing within Clary's past suggests his crime was one of necessity, or one that is justified. He has no history of

10

substance abuse, or other ailments that drove his criminal conduct. In short, there is little to rehabilitate.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

The peaceful transfer of power, "is a solemn and most momentous occasion, and yet in the history of our nation it is a commonplace occurrence." Ronald Reagan, Inaugural Address 1981. The uniqueness of the United States—as described by President Ronald Reagan—was attacked on January 6, 2021. "The orderly transfer of authority as called for in the Constitution routinely takes place, as it has for almost two centuries, and few of us stop to think how unique we really are. In the eyes of many in the world, this every-four-year ceremony we accept as normal is nothing less than a miracle." *Id*.

The history of our nation has seen many different political parties. But throughout our history each has agreed to the basic tenants of our founding. As eloquently stated by our first president, "The very idea of the power and the right of the people to establish government presupposes the duty of every individual to obey the established government." George Washington, Farewell Address 1796. As President Washington continued,

> All obstructions to the execution of the laws, all combinations and associations under whatever plausible character with the real design to direct, control, counteract, or awe the regular deliberation and action of the constituted authorities, are *destructive of this fundamental principle and of fatal tendency*. They serve to organize faction; to give it an artificial and extraordinary force; to put in the place of the delegated will of the nation the will of a party, often a small but artful and enterprising minority of the community; and, according to the *alternate triumphs of different parties, to make the public administration the mirror of the ill concerted and incongruous projects of factions*, rather than the organ of consistent and wholesome plans digested by common councils and modified by mutual interests. (emphasis added).

Although the events of January 6, 2021, was a first, the struggle in creating this more perfect Union has been a continuing one.

The struggle of correctly addressing the crimes of January 6, 2021, is the same struggle this country has faced since its infancy. Although the public administration of imposing a sentence for the crimes of January 6 has become the "mirror of the ill concerted," more is lost when these crimes are treated differently than if they are treated similarly to crimes outside of the January 6 context.

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

One comparison often overlooked when comparing conduct on January 6, 2021, is that many individuals that breached the restricted perimeter did not travel further than the West Plaza. They did not climb atop monuments or travel up the Northwest Stairs. They did not enter the Capitol building through blaring alarms or around lines of officers. Xyan Clary did. He saw what was occurring at the Capitol building and opportunistically took advantage of the situation that he helped to create. His criminal choices need to be addressed.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Clary based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

13

Clary has pled guilty to the one-count Information charging a violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Matthew Mazzocco*, 21-cr-054 TSC (D.D.C. 2021), a defendant was sentenced to serve a period of 45 days incarceration following his plea of guilty to a single misdemeanor offense.[3] In *Mazzocco*, the defendant entered the Capitol through the same door as in the present case. Although the defendant in *Mazzocco* entered deeper into the Capitol than in the present case, there was not evidence that the defendant climbed structures on the grounds. Comparing the 12 minutes inside the building in *Mazzocco*, to the 6 minutes inside the building in the present case, is offset by Xyan Clary leaving through a window.

In *United States v. Jennifer Schwab*, 21-cr-050 CRC (D.D.C. 2022), the defendant entered the Capitol at approximately the same time as in the present case, 3:21 p.m. But the defendant in *Schwab* entered through a *different* door containing an alarm and officers. In *Schwab*, the defendant entered through the East Rotunda Door, and moved into the Rotunda and Memorial

---

[3] The defendant in *Mazzocco* pled guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), a class-B misdemeanor.

14

Door, before exiting the building approximately 7 minutes later. In *Schwab*, the defendant also pled guilty to a single misdemeanor offense with the same final range, but the guidelines level was 8 as opposed to the present case where the level is 2.[4] The Court there imposed a sentence of 45 days incarceration, followed by one year of supervised release.

In *United States v. Mariposa Castro*, 21-cr-299 RBW (D.D.C. 2022), this Court was presented with a defendant that observed what was occurring at the Capitol and left her hotel room to join. In *Castro*, the defendant entered the Capitol through a window immediately outside the site of the most violence on January 6, the Lower West Terrace Entrance. The defendant there also pled guilty to a single misdemeanor offense.[5] But unlike the defendant in *Castro*, Xyan Clary was outside the Capitol for hours. Instead of the evidence of his statements encouraging other rioters, surveillance captures his Gadsden Flag being waved at the site of a breach into the Senate Wing. This Court, in *Castro*, imposed a sentence of 45 days of incarceration and a $5,000 fine.

The same criminal decision-making that occurred in *Castro* is present here. Clary observed what was occurring and needed to gain entry into the building. Clary was in the building nearly the same amount of time as the defendant in *Schwab*, and ultimately entered the same door as in *Mazzocco*. In each of those case, Courts have imposed 45 days incarceration. The same is proper here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

---

[4] The defendant in *Schwab* pled guilty to a violation of 18 U.S.C. § 1752(a)(2), a class-A misdemeanor.
[5] The defendant in *Castro* pled guilty to a violation of 40 U.S.C. § 5104(e)(2)(G).

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Clary must pay $500 in restitution, which reflects in part the role Clary played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Clary's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

## VII.     Fine

Xyan Clary's conviction for violating 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Clary to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Here, Clary has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $200 to $9,500. U.S.S.G. § 5E1.2(c).

## VIII.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Xyan Clary to 45 days of incarceration with 24 months of probation. Such a sentence promotes respect for the law, and deters future crime, by imposing restrictions on Clary's liberty as a consequence of his behavior, while recognizing the acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:        /s/ *Adam M. Dreher*

ADAM M. DREHER
Assistant United States Attorney
Michigan Bar No. P79246
601 D St. N.W.
Washington, D.C. 20530
(202) 252-1706